You'll hear argument this morning in Case 17-17-17, the American Legion v. the American Humanist Association, and Number 18-18, the consolidated case, Maryland National Capital Park and Planning Commission v. the American Humanist Association. Mr. Katyal? Thank you, Mr. Chief Justice, and may it please the Court. There are four important facts about the memorial at issue, the Peace Cross, that explain why it should not be dismembered or destroyed. First, families in the Legion built it 93 years ago to commemorate 49 brave souls who gave their lives in World War I, and it has stood since that time without challenge. Second, it's no ordinary cross. At its center, in its heart, lies the American Legion symbol. It's gigantic, and at the base and four huge capital letters are words, Valor, Endurance, Courage, Devotion. Third, not a single word of religious content appears anywhere. Rather, the base has a nine-foot plaque listing the 49 names with an inscription to them. And fourth, the monument is situated in Veterans Memorial Park alongside other war memorials. Do you know how many other parks are like this one? I've looked at pictures, and it's an unusual park because there's major highways dividing it up. It's almost as if the city artificially designed an area that's huge to encompass other plaques and declared it a park, but you can't really tell that this cross is with anything else. There's three or four six-lane highway on one side. There's another highway on the other. I'm told you can't even get off the highways to walk to this cross. Oh, no, you actually can. I've done it. There's parking and so on. So I disagree with that representation. Veterans Memorial Park has been there for a long time. The record shows at least since 1983. So this isn't like McCreary in which there's some pretextual stuff added later. All right. And you said dismember or destroy. You can move it. You could. You could transfer the land to private entities, correct? Well, you could. Those would be hypothetically possible, but the record shows that those — So it's destruction and anything else. Well, Justice O'Toole, the record, this is the Court of Appeals Appendix 623 and 1585. So if you move it because of the cracks in this cross, it very well may be destroyed. Give it back to the Legion. Give it back to the Legion. As our petition reply brief at page 12 points out, they have an email in this case saying they know that Maryland can't do that because of the traffic concerns. They can't give it to a private entity. The Maryland brief before this court also makes — They could speak to that. But putting that aside, are you relying on the fact that at all, that at least one brief claims that all 49 soldiers named on this plaque or for whom this plaque were, were Christian? Not at all, Your Honor. We think this memorial from start to finish has been about honoring those 49 plus all World War I veterans. Are you just grandfathering this or are you claiming that today, let's say for the Vietnam War, that any government, local or state, could build a cross 40 feet high, not put any emblem on or some sectarian emblem and say, we are dedicating this to all the soldiers who have died in the Vietnam War? So we're not at all saying that grandfathering or anything like that. This case, because of its 93-year tradition, is an easy one. And for reasons Justice Breyer said — No, no, no, but answer my question. What is the tradition? Is the tradition that in World War II a cross was used or is the tradition that the government can put up sectarian symbols like crosses or a picture of Jesus Christ in honor of anyone? Because that's within the nation's tradition. So Justice Schumeyer would make two different arguments. One is with respect to this cross, which has stood for 93 years, 86 of them without challenge. And for reasons Justice Breyer's opinion and Van Orden said in the Buono plurality, that would make this cross constitutional. Now your question is, well, what about this tradition of crosses in general? And it's true, we have a second argument about Town of Greece, which says that if there is a long tradition of the type of displays, that would make it constitutional. Notably, however, it doesn't make your hypothetical constitutional. Your hypothetical is actually a real case. Lake County, the Seventh Circuit case in 1993, is a huge cross with Jesus Christ nailed in the center of it in a public park. It's been there since 1955, and it was protested right then. And the Seventh Circuit said that is unconstitutional, and we agree. What would happen if all the facts that you gave were the same, except for the 93 years? In other words, a community decides for whatever reason we don't have a World War I memorial, we want to put up exactly this to memorialize the war dead from World War I, but now? Right. So if it's a war memorial, we do think that it would be constitutional. We think that there might be some skepticism. You just want to make sure that it wasn't a pretext, and it didn't look like that cross I was describing about Lake County. But if it was a cross like this one, same facts, Justice Kagan, we do think that would be constitutional. And does that answer apply not just to memorials for World War I soldiers, but to memorials for soldiers from any armed conflict? Well, I think that it probably would, that there's a tradition of using these crosses with respect to any conflict. But it would have to look like this one. Mr. Cantor, what about not a World War or any war memorial, but a memorial to a tragic event? Let's say a mass shooting at a school. Could the local community then decide it wants to put up a cross in front of that school to honor the children and the teachers who died in the mass shooting? Well, I think the test, Justice Ginsburg, would be whether there is an independent secular purpose. So take a real case like the one that came out of the World Trade Center, the Second Circuit case from 2014, where two steel beams were discovered in the rubble, and they were put up in the shape of a cross. Now, if that were in a public park, I think that that would be permissible because it has independent historic value and independent secular value, showing values of resilience and courage. My example was nothing that was found in the rubble. It's just the local community decides it wants to honor the dead in this terrible tragedy. Right. The test would be whether or not there's an independent secular purpose. I don't think you could probably hearken back to the same tradition that you could with respect to, for example, these World War I crosses. The purpose is to honor those who died in the tragedy. Yes. So, yes or no, could you? I don't think purpose is what this Court's decisions turn on. Van Orden and the Buono plurality say that it's objective meaning. I thought you just said that the test is whether there's a secular purpose. I meant objective meaning. I'm sorry, Mr. Chief Justice. The test is your opinion. You joined in, Buono said. What is the objective meaning of this display? Now, sometimes purpose is relevant to that, and the Court has looked to it, but the test is always that. So, it would be okay, then? It would be okay to put up in front of the public? Well, I think we need to know more about the facts of that particular hypothetical. Well, here are some facts, Mr. Cottrell, from that hypothetical. And you can understand how something like this can come about, that people want to memorialize the dead. And in one religious tradition, and a dominant one in many, many communities of this country, the preeminent symbol to memorialize the dead is the Latin cross. And so they gravitate toward that symbol as a way to memorialize the dead. But at the same time, for members of other faiths, that symbol is not a way to memorialize the dead, and does not have that meaning. So I think that the question that Justice Ginsburg is asking, you know, for many people, this is a very natural way to do exactly what they want to do. For others, not. And Justice Kagan, if it does have the same hallmarks as this type of cross, we think that that would be permissible. That is, and I think that's a natural consequence of what this Court's already said in Buono, in the plurality, and the Van Orden opinion. I read your brief to put a lot of weight on the fact that the cross here has more than a sectarian meaning, because as your history sets forth, the cross was a symbol throughout the battlefields in World War I. Now, I'm wondering why that doesn't limit your argument, so that in such a case, as Justice Kagan hypothesized, you would not accept that. Mr. Chief Justice, we certainly agree that all of that tradition, the fields of Flanders and stuff, make this a very easy case, and we don't think you need to go further than this. In the fields of Flanders, are all of the graves marked by crosses? Are there not graves marked by stars of David? There certainly are some, but I think the dominant image of the time, everything from that poem to art to the war bond advertisements that the United States government put out to the 1924 Congressional Resolution, all did use this cross. And that's why we agree, Justice Ginsburg— But I've visited some of those battlefields, and there are stars of David marking the graves of Jewish soldiers. Quite true. We're not disagreeing with that. We're just saying that here, and this is what the Buono plurality recognized in Justice Alito's separate opinion, that there is a secular meaning with respect to these— What do you say to the Jewish war veterans brief that say, and for those Jewish soldiers, the government's decision to honor only the salvation that Christians believe is hurtful, wrong, and not in keeping with the promise of the Constitution? What do you say to that? I'd say three things, Justice Kavanaugh, and then if I could reserve the balance of my time. The first is that factually, one of the main proponents and fundraisers of this particular cross was J. Moses Eldovich, who himself was a Jewish veteran. Second, there's a contrary tradition that the retired flag officer's brief at page 9 says that some Jewish vets were actually put and buried under the cross and wanted to be. And third, I don't think this Court has ever adopted the view that if some people disagree with something, that that itself creates an establishment clause violation rather than test the objective meaning. If the Chief would permit me, there is a brief here that says that to deeply religious Christians, secularizing the cross is blasphemy. Christ died on the cross. He was resurrected from his grave. So those people don't view secularizing the cross as something, it's not just Jewish people or Hindu people who might be offended. It could be Christians as well. Justice Sotomayor, my answer will be the same as the third part to Justice Kavanaugh. I don't think we let those objectives dictate that. If that were the rule, you'd be tearing down crosses at Arlington Cemetery and nationwide. The U.S. brief at page 29 says that. And I think that would actually inject this Court and create more of an establishment clause problem and so religious divisions. Thank you, Counsel. Mr. Carvin. Mr. Chief Justice, and may it please the Court, while the peace cross should be upheld under any sensible establishment clause analysis, we submit the Court should analyze it under the Town of Greece coercion test, which prohibits tangible interference with religious liberty as well as proselytizing, for a number of reasons. We think this is the simplest route. You would simply extend Town of Greece rule for religious speech to symbolic speech and would provide in a situation where the chances for coercion and proselytization are much less than in the communal prayer. Mr. Carvin, could you explain, you have this coercion theory that you think you're urging us to adopt. But if that's what the establishment clause prohibits, only coercion, how does its office differ from the free exercise clause? That is, can you suggest a practice that would be unconstitutionally coercive under the establishment clause and yet be inoffensive under the free exercise clause? Yes, Your Honor. Forcing us to pay three pence to a minister. That wouldn't violate my negative liberty not to support a church I don't want to, but it wouldn't violate any religious tenets for my ability to pursue the religion I do want to. So it creates a negative liberty not to support coercively religions which you do not support. I would also point out that this standard is completely the correct one under the text and history of the establishment clause because when they were discussing all the hallmarks of establishment, what they were talking about was tangible interference. It also extends to proselytizing under this court's decisions in both town of Greece and the Allegheny County dissent which is what we're asking. What counts as proselytizing? I think I understand what coercion means better than what proselytizing means. Well, I think this is actually very straightforward. The definition is preaching conversion. Lower courts have said this is aggressively advocating conversion from one sect to another. What's the difference between that and endorsement? Well, you tell us we should abandon Lemmon's endorsement test because it's become a dog's breakfast. Nobody knows how to apply it. Circuit courts are confused, you tell us. And then you replace it with coercion, but now maybe proselytizing in the reply brief. I don't see the difference between proselytizing and endorsement. Can you help me out? We think there's a fundamental difference, Justice Gorsuch. Under our test, all symbolic, including sectarian symbols, would be presumptively valid except in the rare circumstances where they've been misused to proselytize. Whereas under the endorsement test, all sectarian symbols are unconstitutional. Suppose a city erected a cross not for purposes of memorializing the war dead but just to emphasize the values of Christianity. Would that be proselytizing or would that not be proselytizing? I think, again, that stays very close to the hypothetical that Justice Kennedy put in the Allegheny County dissent where you've got a permanent Latin cross on top of the city hall. Right, this one is not on top of city hall. This one is, you know, in a park. Oh, well, then I think it's very much like Panette. If they've got other symbols there and they allow it. It's just a cross. They want to emphasize the values of Christianity, so they put up a cross. I think it would be a very rare case where unless you were sort of conditioning access to government services like one on city hall would certainly suggest that that would either constitute de facto establishment or de facto coercion. And I don't think the other side can provide a real-world hypothetical involving a cross that could be misused for proselytizing purposes, which is why I think the endorsement standard is important. Well, I guess what I was trying to suggest was that this was something that indicated that the city was aligning itself with one particular religion. We're putting up a cross. We're not putting up any other religious symbols because we believe in the values that the cross indicates. But it's not on top of city hall. It's on the street. It's in a park. Maybe there are two crosses. Maybe there could be ten crosses, you know, different parts of the city. But that's why the city is doing it. And, of course, everybody recognizes what a cross is. Right. It's a relatively straightforward inquiry, Justice Kagan. Is there a legitimate non-proselytizing purpose that is returning? Well, is there? Again, in these circumstances, I need to know was this, for example, suggested by people who were honoring the victims of the school shooting? Was it simply what was the genesis? You need to look at it. It's just a cross. It really is. So, you know, these values are important to this community, the values of Christianity. So we would like to put up some crosses around town. Oh, again, if that's the announced purpose and effect of aligning ourselves with Christianity, then I would think it would be such as proselytizing. Suppose after this case, Hyattsville puts up a cross and College Park puts up a cross and the surrounding communities put up crosses, and there's mixed purposes. Some people do it because they want to support it because they want to celebrate Christianity. Some people do it because they say we want to celebrate war dead. There's mixed purposes. Proselytizing or not proselytizing? Again, I think sectarian symbols are presumptively valid, Justice Kavanaugh. Presumptively valid, and that presumption can be overcome when? Again, if you show that there isn't a legitimate non-proselytizing. I was just going to say you start out with what you advertise as a pretty concise test, but it degenerates pretty quickly into, well, I need to know about this, I need to know about that, and becomes kind of a fact-specific test rather than the CRISPR one that you propose in your brief. Your Honor, we could have a bright-line test that only formal coercion is prohibited, but I don't think that would satisfy this Court because the dangers of the Establishment Clause posed by coercion, which is tangible threat to liberty, could be reached indirectly through the sorts of things I'm talking about. And it is true, of course, that every test that this Court adopts needs to focus on contest, purpose, and effect, but the key point is you're asking a different question than you are under the endorsement test. That's where I'm just stuck. To say I endorse something, what's the difference between saying I endorse something and I proselytize or promote, perhaps, is another synonym, something. It seems to me that you are taking us right back to the dog's breakfast you've warned us against. And I do understand the coercion test, but I don't understand your abandonment of it. Fair enough. In God We Trust certainly promotes religion, endorses religion, no question about it. But it's not an effort to proselytize. Justice Scalia once asked a question when somebody gave that example. He said, what would happen if a client had said, In Jesus Christ We Trust? And again, that's actually a very nice illustration of the distinction. On day one, we've got In God We Trust, which is promoting, endorsing religion, and is no good under the Lemon Test. On day two, we've got In Jesus We Trust. What message is the government sending? You can't trust this Jewish God. You've got to take sides in a sectarian dispute where Jesus is the one we're doing. And if they are taking sides in a sectarian dispute, as Justice Scalia pointed out, that's precisely the definition of what constitutes an establishment. Why am I not proselytizing religion when I say In God We Trust, but I am when I say In Jesus Christ We Trust? I'm just proselytizing religion in a more generic sense. That's fair enough, and I think Justice Scalia would respond to this. There we are. No, but the difference between promoting religion versus irreligion and promoting one sect over another, which I think the sectarian point would obviously lend itself to proselytizing. In this context, I do want to emphasize that all symbols are sectarian. There's no such thing as a non-denominational religious symbol. What's your answer to the cross on City Hall? I didn't get whether your answer is that's unconstitutional or constitutional. Again, we're seeking to have this court adopt Justice Kennedy's dissent in Allegheny County. And in that dissent, he said that a cross on City Hall would be unconstitutional. Do you agree? Because it constitutes proselytizing, and we certainly do agree. I think in all contexts, you need to be careful. If it was Las Cruces, New Mexico, and, again, there was a legitimate non-proselytizing reason for the permanent cross, but as a general matter, sure. If they're putting up crosses at every courtroom, every DMV window, and all the parade of hypotheticals we've gotten on the other side, I can certainly understand why somebody would believe that they're trying to convert you to Christianity. After all, the hallmark of the establishment in Professor McConnell's article, which we're largely relying on, is they're seeking to inculcate a certain religious belief, a certain sectarian belief. Well, but if you look at his—and, of course, you have— his brief highlights six things that he would say would be— and it starts out with the government establishing a church. All right, we'll give you that. You know, requiring people to pay for the church, prohibiting imposing burdens on people who don't believe in— I mean, they're all pretty stark items that certainly underlay the establishment clause when it was adopted. But you're certainly—I don't understand your position to be limited in that way. Again, we could certainly say that kind of direct formal coercion is the only thing reached by the establishment clause. Both of the opinions we rely on, town of Greece and Allegheny County, go a bit further, and they say in the real world, we want to make sure we're not creating the same dangers when the government is trying to create indirectly what it couldn't do directly. Again, this will be a rare exception. They can't provide a real-world hypothetical. If the court doesn't want to go that far— So we go back to Justice Gorsuch. Yes. I hear you using the word de facto extreme proselytization, de facto coercion, excessive promotion of proselytization. It is the endorsement test. Now, you may make an argument like your colleague that this has to do more with tradition than it does with coercion, but it is endorsement. To make it as simple as I can, under the endorsement test, a sectarian symbol of a crush is no good. Under our test, it's perfectly fine because it's— So you would overturn Allegheny in that theory? I would endorse the town of Greece test, which says sectarian prayer, purely sectarian prayer, is okay. Sectarian speech and— But you proselytize that test. Excuse me? You endorse the test, you proselytize for it. We are actually adopting the word proselytize from the town of Greece test. And, again, my final point on all of this is, in the symbolic context, this distinction is not of real-world consequence because all symbols are sectarian, and if you ban sectarian symbols, then you are necessarily banning all religious symbols, which evinces hostility and is in stark tension with the free exercise and free speech laws. Thank you, counsel. General DeMol. Mr. Chief Justice, and may it please the Court, three points. First, under town of Greece, the memorial cross is permissible because it falls within our nation's long tradition of accommodating religious speech or symbols in civic life. Second, adhering to town Greece would easily resolve— In all places, meaning, I don't know of a founding father, town, or state that put up a 40-foot cross on government property. So we don't have a long tradition of that. It's sectarian. We have a lot of founding fathers, including George Washington, who was exceedingly careful to ensure that references to God were as neutral as possible to as many religions as possible. So it can't be that all sectarian symbols, whether it's a cross or Jesus Christ or some other symbol, is within our tradition merely because we say in God we trust. Well, two things, Justice Sotomayor. First, obviously, this symbol has a unique history of the Buono plurality detailed. The VFW brief, I think, does a nice job of this, that to the World War I generation, though it's now distant in time, that was a secular or civic meaning that it took on to that generation. You limited your point to one generalized point, which means we could put it up today to memorialize all Vietnam vets, despite the fact that all Vietnam vets were not Christian, and that many of them would feel... Yes, just as Mr. Catchall said, when they found the cross at Ground Zero in the rubble and that became a makeshift shrine in the weeks after 9-11, I don't think that that violated the establishment clause, just as it doesn't now when it sits in the 9-11 museum owned by the Port Authority. But the second point I'd make is I understand Town of Greece and the Allegheny County descent to say you either trace a practice back to the founding or you look to see whether it's akin to the kind of acknowledgments that the founders and the early generation thought were permissible, and you ask whether it presents any greater dangers than that. Here, crosses have been memorials since before the founding. They have been war memorials since the post-Civil War generation, the one that incorporated... The change from the founding, this was an almost overwhelmingly Christian country. But now we're told that 30% of the U.S. population does not adhere to a Christian faith. Does that change make any difference? I don't think it affects whether the cross took on in the wake of the Great War a secular meaning and whether that's the meaning for which the mothers erected it and the commission now maintains it. So when Canada gave us the Canadian cross as sacrifice to honour Americans who went north and joined the Canadian forces to fight in the war before America entered, I have no reason to believe that all of those Americans were Christian or that Canada thought they were, but it's thought that a cross with a sword running down it in Arlington would commemorate all of them, and I think that's the meaning that the Buono plurality correctly said in that context. Isn't a cemetery substantially different than the middle of a town where something is 40 foot high? I mean, I have pictures of this cross. It's the only thing that's that high. It dwarfs buildings. It dwarfs people. You can barely see them in the pictures. I mean, with all respect, Justice Sotomayor, and obviously this is more under the reasonable observer test and we've asked the court to apply town of Greece, but having been out to the site, it is certainly a tall cross, but it has words on it that are visible from hundreds of feet away that are secular words. It's in the midst of a number of other memorials that you can see. It's been part of a memorial park for decades before litigation was ever brought. I understand the concern if you just look at the size, but that ignores the fact that there's U.S. on both sides of the cross, the words, the plaque. It's all of the cross' surrounding context. Where you want to draw the line, just take a lot, I'm going to give you an example of a bunch of different crosses. So one is World War I cross, erected many, many years ago. Another is World War I cross, erected now. A third is another war memorial cross. A fourth is a memorial cross that has nothing to do with any war. A fifth, are we up to five? A fifth is not a memorial cross at all, just a cross. It's a cross because the community wants to put up a cross. Are they all okay? Are some not okay? I think the first three are clearly permissible, assuming the fourth acknowledges the non-war purpose to which the cross is put. So the cross that commemorates the school shooting or the Star of David that commemorates the Holocaust, that seems to us perfectly permissible. No more coercive or proselytizing than things that the founders thought were perfectly permissible. The last strikes me as potentially quite problematic. When Justice Kennedy says in Allegheny County, and the court picks up on it in the town of Greece, that you can't proselytize, it understands that, Justice Gorsuch, as a much higher standard than are you offended or excluded. It understands that as are you threatening damnation, the court says. Are you trying to force people into the pews? Are you denigrating another faith? If a town just starts putting up naked, unadorned crosses without any clear secular reason. Excuse me. All five crosses in Justice Kagan's hypothetical I believe are the same. Well, no, I'm sorry. I thought the purpose articulated, unstated, or stated but not visible might be different, but the crosses are all the same, and you're saying it depends on the implicit purpose or reason it was put up? Maybe I misunderstood the hypotheticals. When Justice Kagan was positing war memorials or a cross dedicated for some other secular or civic reason, all of the examples in the real world I'm aware of make that clear in some way. The Argonne Cross says to those who perished in France. I took the fifth one to be the naked, unadorned cross, and that seems to me to get much closer. So if that's put up as a war memorial but it doesn't have words around it, that has to come down? Justice Kavanaugh, I'll grant you that that's the hardest case, and where the town just says we're putting it up as a war memorial, it may be permissible as long as the other side will grant that all of the hard cases on this test are imaginary. You can't find a single one that looks like that. The problem with the current law is that all of the current cases are hard. This case, which should have been easy, has a four-volume JA, and we had expert witnesses and mounds of discovery. Could you take the examples I gave that are neither the first nor the fifth? In other words, just the memorial crosses but not any particular relationship to World War I and erected now. On what theory are those permissible? In other words, is the theory that this is a universal symbol? Is the theory that this is a secular symbol? Is the theory that this is a religious symbol but that's perfectly fine to adopt one religious symbol rather than another? What's the theory? I think the theory is, and the real-world example I'd give, is the cross at Ground Zero. I point the court to the Second Circuit case. I think that that's an odd kind of case, so I think let's not talk about that one. Let's just talk about your ordinary decision to erect to, you know, not anything that's found in a, you know, let's just talk about an ordinary municipal decision to erect a cross as a way to memorialize some group of citizens. My only point was there aren't a lot of these memorials going up. That's a new cross that I think was perfectly permissible because it presents no greater dangers than the kinds of acknowledgement of religion that have existed since the founding. But if you took a new war memorial, if Bladensburg tomorrow wanted to erect a memorial like this one, we think that'd be perfectly permissible and indeed an honorable thing for a locality to do. And I guess I ask, why is that? Is it because the cross has become a symbol that's universal? Is that what your claim is? I think because as the Buono plurality said, it has taken on a secular meaning associated with sacrifice or death or commemoration, and a locality, a state can decide to use it for that meaning. I mean, it is the foremost symbol of Christianity, isn't it? It invokes the central theological claim of Christianity, that Jesus Christ, the son of God, died on the cross for humanity's sins and that he rose from the dead. This is why Christians use crosses as a way to memorialize the dead. Is it because it connects to that central theological belief? Isn't that correct? So I'm not going to dispute that obviously it's the preeminent symbol of Christianity. I believe all of the members of the plurality in Buono believe that too. The question is whether it's also taken on a secular meaning because to say the cross has only that religious meaning, I think would condemn every cross in the public sphere, including the ones that sit in Arlington, which even respondents say we don't have to take that. So we know that context has to matter. Does it matter in this particular case that this cross was put up to commemorate the deaths of 49 real people and that this was done in the wake of World War I? I think, Justice Alito, it makes it an easier case, but what I would say is we have four basic buckets of litigation over displays in the state and federal courts. You've got war memorials, Ten Commandments, holiday displays, and other forms of symbolic expression like mottos or seals. I don't think the reasoning here is specific just to the cross bucket, though I do think it would take care of the vast bulk of war memorials that are being litigated. I think the logic of town of Greece that we're urging the court just to apply in this related context is do any of those present greater dangers than the acknowledgements of religion in the public sphere that have existed since the founding? We would say that because they do not, we would ask the court to allow the cross to remain and to allow those at honors to rest in peace. Thank you, General. Ms. Miller? Mr. Chief Justice, and may it please the court, I think we can all agree that the Establishment Clause, at the very least, prohibits the government from preferring one religion over another religion. And the Commission is arguing, essentially, that its cross does not violate the central command of the Establishment Clause because it's essentially a non-religious, non-Christian symbol that honors everyone irrespective of their religion. Yet I don't think anyone here would deny that it would be unconstitutional and inappropriate to go into Arlington and place a Latin cross over the grave of every person there, every fallen soldier, irrespective of their religion. In fact, in 1924, everyone in the Congressional debate about the overseas markers was in agreement that it would be completely inappropriate and even sacrilegious to put a cross over the burial of a Jewish fallen soldier. But the Commission is here arguing today, as well as the other petitioners, that it is telling Jews, telling Muslims, telling humanists, that the cross honors them when they emphatically say it does not and is telling Christians that their most preeminent and sacred symbol of Jesus Christ actually, in fact, also symbolizes atheism. Could I ask a question that picks up on a question that Justice Ginsburg asked earlier? So let's say there is a shooting at a church and Christians are targeted and killed. There is a shooting at a synagogue and Jews are targeted and killed. There is a shooting at a mosque and Muslims are targeted and killed. In each case, the town says, We are outraged by this. We want to put up a monument to express our sympathy and solidarity with the families and with the communities that they represent. They ask those people, What kind of monument would you like? And they all say, It's very important for us to put up something of religious significance. And the town does that. Those towns do that. Would that be a violation of the Establishment Clause? Your Honor, I think it depends, of course, on the context. But I think, for instance, if we're talking about a 45-foot cross in the middle, or sorry, a 45-foot Star of David in the middle of a roadway, I think that that would be a problem. If, say, like an obelisk with maybe a Star of David that's not as loud, you know, we're actually trying to, you know, I think the commemorative purpose would need to predominate over the sectarian. Well, that raises for me, that answer raises for me a question about standing. Is it too loud? Is the Star of David too loud? Is it too offensive? There aren't many places in the law where we allow someone to make a federal case out of their offensiveness about a symbol being too loud for them. We accept that people have to sometimes live in a world in which other people's speech offend them. We have to tolerate one another. This is the only area I can think of like that, where we allow people to sue over an offense because, for them, it is too loud. And we get into, as a result, having to dictate taste with respect to displays. We have a Ten Commandments display just above you, which may be too loud for many. Why shouldn't we apply our normal standing rules and require more than mere offense to make a federal case out of these? Yes, Your Honor. Well, I don't think that it's mere offense. It's about being a citizen in your own community. And it's not private speech we're talking about. We're talking about the government being the speaker and essentially giving you the message as the non-Christian in your community that you are a lesser citizen. And I think if you look at our record and the letters that were sent to the commission by self-proclaimed Christians that were outraged by the notion that their cross must have to be removed, you see that monuments like this contribute to the idea that non-Christians are inferior. We are Christians. We can put a cross wherever we want to. Well, just to follow up on Justice Gorsuch's question, what if you had one letter from one person who purported to be offended by it? Would that be enough to support your argument? Well, no, Your Honor. I think it would have to be that you are a member of the community, that you've had the encounter. I mean, Valley Forge says that you can't be someone in another state that read about it in a newspaper. You have to be personally affected by the message. And if you are a citizen in a community, you are usually within the zone of interest of someone that would take offense or feel marginalized by the display. And here all of the plaintiffs are individuals who are non-Christian who say that when they encounter the government symbol saying that Christians have valor, Christians have courage, Christians have devotion, Christians have endurance, those words on the base, that says something to them. And I think, you know, when you look back at the record in the 1920s, Jews were fighting immense discrimination. A lot of them joined the war to combat the stigma that they were considered cowards. And I think one of the amicus briefs even had a letter from a Jewish soldier who had to put on his own Rosh Hashanah because they wouldn't accommodate the Jewish soldiers with their own. I mean, this would be a different case if some of those 49 soldiers whose names are associated with this monument were Jewish or Muslim or a member of some other non-Christian faith and the town insisted on putting their names on a monument in the form of a cross. But there's no evidence that that's what happened here. Is that right? Two things, Your Honor. One, we don't know the names. We don't know the religious beliefs of those on the cross. What we know is that there's about 14 of them, seven of whom are buried in Arlington, but do not have a cross on their headstone, even though Arlington had the cross as an available evidence. All right. Well, it's speculation. But we don't know that there was anybody who objected, that there was any family who objected to having this form of a memorial for their fallen family member, do we? I think there's an inference that can be made from the fact that the government's records refer to 52 to 54 Prince Georgians who died in World War I, and they only have 49 names on the cross. But I would also submit that the government has basically forfeited that argument by having this elaborate public rededication ceremony to rededicate the cross as a memorial for all veterans of all wars. That's how the town's treated it. The commission's here today saying that this is an everyone memorial. There are cross monuments all over the country, many of them quite old. Do you want them all taken down? No, Your Honor. And I actually would submit that there's a lot of exaggeration and distortion going on. So which ones do you think can stand? Well, certainly the two in Arlington, and there's several reasons. One is that much like the practice that was in Town of Greece where the town created a forum for private citizens to deliver prayers of their own idiom, there is a statute that governs monuments in Arlington that says that it basically creates a nondiscriminatory, religiously neutral opportunity for people to place their own monuments in Arlington subject to a lot of rules, but two of which are the... Yeah, that's the way this sort of thing is being handled today in a pluralistic society in which ordinary people get along pretty well and are not at each other's throats about religious divisions. But let me ask you about some others that are not in Arlington. How about the Irish Brigade Monument at Gettysburg put up in 1888? Yes, Your Honor. Well, it's one of, I think, something like 3,000 monuments within Gettysburg Park. It presents itself as almost an object in the museum. And it's not to say that museum context can always negate the government's imprimatur, but it seems in that context that government is more like a curator of a museum than it is putting it up. I mean, remember, this was put up by the town of Bladensburg. May I ask about this cross? I was just going to ask, I understand Native American totems have spiritual and religious significance. If one of those is on federal property, does it have to be torn down? I would say no, Your Honor, but I would think that we'd need some sort of expert testimony to sort of talk about what that means. I think in common... Well, it has spiritual and religious significance for Native Americans similar to, let's say, religious symbols, Star of David, a cross. It's difficult. I know that the Ninth Circuit had a case that dealt with an Aztec, an ancient Aztec symbol, and they concluded that it didn't violate the Establishment Clause, in part because no one would reasonably think that the government that was predominantly, I think, Christian in that community was erecting, it was to commemorate Mexican culture, would actually be trying to endorse the Aztec religion. So I think context would matter. I think that... So if the local government in the community were Native American, whether it's on the reservation or a native village in Alaska, that would make a difference? You know, I think you'd have to understand more about the symbolism and what it means if there is some sort of dual secular meaning, such as with the Ten Commandments, how it's basically shorthand for lot self. So if in context, it's intended for the secular aspect to predominate, perhaps, but it's hard to say with... This cross, Ms. Miller, very old, was erected almost 100 years ago, right after World War I. It does have its two fallen soldiers from World War I, and World War I does have this history, that this is how soldiers were memorialized in World War I. And it's true, not all soldiers, when you go into a World War I battlefield, there are stars of David there, but because those battlefields were just rows and rows and rows of crosses, the cross became, in people's minds, the preeminent symbol of how to memorialize World War I dead. And then you have these other facts that Mr. Katyal started us off with. There are other war memorials around the park. There are no religious words on the memorial. Quite the opposite. All the words on the memorial are words about military valor and so forth. So why, in a case like that, can we not say, essentially, the religious content has been stripped of this monument? Well, Your Honor, I don't think you can say... Or the particular religious content. I don't think... I'm not aware of any case or reason to say that a large Latin cross can be stripped of its religious meaning. I don't think it needs special words to announce that this is a religious symbol. I think that... Well, hold on. Just a moment ago, you told us that Ten Commandments can be stripped of their religious significance and that an Indian totem pole may be stripped of its religious significance. Why not so, too, here? Well, as far as I'm concerned, I'm not aware of any secondary meaning that's derived from the Latin cross. Its meaning as a war memorial is distinctly for Christians. There is no evidence that... Well, I guess what I'm suggesting... ...to this World War I context, because I think there's something quite different about this historic moment in time when... So if you look at all the crosses that are war memorials, basically all World War I memorials, that this was sort of... Because of the battlefields and the way the crosses were erected there, this became the preeminent symbol for how to memorialize the war dead at that time. Why isn't that important? Well, Your Honor, factually speaking, the Doughboy statue was by far the most common. In fact, on this record, I'm only aware of six other crosses, inclusive of Arlington, that are World War I memorials on government land. The few others that they cite are actually on private land. The ones in Baltimore, for instance, one has Jesus Christ written on it. So that says to us at the same time Bladensburg Cross was being put up, other World War I memorials were being put up in direct recognition of Jesus Christ. That was the understanding at the time. These are Christian symbols. Again, the government's argument in this case is not that this is a Christian symbol anymore, but that it in fact represents Jews and atheists and Muslims. And I think that there's no history whatsoever of anyone using land crosses to honor Jews, Muslims, and atheists. And as the brief of the Joint Baptist Committee and all the other representative groups that represent millions of Christians in this country find that argument deeply offensive and could potentially degrade their religion. I take your point that it's a religious symbol. I'm not going to dispute that at all. But our cases have upheld religious displays and religious words in cases like Marsh, the chaplain in Congress and the prayer, cases like Van Orden, the Ten Commandments, cases like Town of Greece, legislative prayer before a meeting. How do you square your position in this case with those cases which have upheld religious symbols, displays, or words in government property or government events? Yes, Your Honor. I would start with Town of Greece because I think Town of Greece is about as akin to, say, Arlington Cemetery as any case can be. There the court was saying that when the government takes essentially a hands-off position with respect to the sectarian content of the prayers, it's not to say that it's private speech, but the government isn't being the mouthpiece for the sectarian message. When the government is the mouthpiece, when it is 100% the government... What about the Ten Commandments then? With respect to the Ten Commandments, I realize that that is something that this court has routinely recognized as a dual-meaning symbol. Although, yes, there are commandments that are certainly religious, the court has seen it as something that is more economical, Were those statutes built by private people and placed in the parks? The Ten Commandments? Yes. I believe the Eagles was the primary donator of most of the Ten Commandments displays at issue, and my understanding, especially in reading Justice Breyer's concurrence, was that the fact that the Ten Commandments didn't predominate in this setting, they weren't the largest, they were in line with all these other displays, that the secular aspect of the Ten Commandments, the one that says, you know, this is how law was founded, this is symbolic of law, predominated. But there's nothing in either the plurality or Justice Breyer's opinion that I read to say that context can somehow strip a Latin cross of its sectarian meaning. They have 54, in the briefs, 54 examples of things that people might bring cases, and if you win, tear them down. Well, there may be more, there may be fewer. What do you think of saying, yes, look at the historical context here. History counts. And so, yes, okay, but no more. That's what Justice Ginsburg, I think, was bringing up. But no more. We're a different country. We are a different country now, and there are 50 more different religions, and therefore, no more. We're not going to have people trying to tear down historical monuments, even here, okay? Now, what do you think of that? I'm not suggesting I'm for it. I want to know what you think of it. Sure, Your Honor. I mean, I think two things. One is, again, the exaggeration that's going on on the record that there's somehow 50 or hundreds, we've gotten all sorts of numbers, of crosses that are on public land. They cite, for instance, 50 examples of something that's not a cross. It's a boot with a rifle and a helmet, and it's cited in the petitioner's reply brief, the commission's reply brief, I think, at page 17. They refer to a cross in Louisville, North Carolina. It's not a cross. They cite about 50 examples of that. They cite crosses on private land. I counted about 15 amongst the amicus briefs on private land. So I'd say there's something closer to about 10, maybe 20, and that is inclusive of crosses that are quite small. With respect to history, there are a lot of reasons why religious minorities in Christian-dominated societies would not feel safe challenging an actively used war memorial that is the town's most prominent symbol. You know, my clients have been threatened. I've received death threats, and I bet you it was not safer 90 years ago than it is today. Also, I don't think that you can say that this is just some sort of passive display that people don't take note of. Like I said, if you look in the record, look at the letters, how people are processing a monument like this. Sort of like a billboard, it kind of ingrains in your mind that there's this association between being Christian, having valor, having courage, and what message that sends to religious minorities and Christian members of the society that are the majority. Well, but that's one of the main criticisms of the Lemon Test, that different people are going to process that in different ways. I mean, you heard from one of your friends on the other side that one of the major fundraisers in this was a Jewish individual. So he was obviously observing it or anticipating it in a different way. Well, Your Honor, I think that we cannot take one person's example. Again, someone who's probably one of maybe the only Jewish people in that county at a time when there was an active plan, burning houses, burning Jewish buildings or Jewish businesses at a time when atheists couldn't run for office. Jews had to swear that they believed in afterlife in order to qualify. I mean, I can't imagine today... There were 12. Are there 12 African-American soldiers among the 49? I believe there are, and I believe that the question... And do you think that the situation of African-Americans in Prince George's County at that time was worse, was better than the situation for Jews? Here's what I'll say to the plaque. The names that are on the plaque are the same names that are put up on the one in Upper Marlborough. I don't believe there's any evidence that the town of Bladensburg knew who was on the cross. About a third of the men actually have no apparent connection to Prince George's County. They named some guy in Philadelphia who had no connection here. So I don't know how they got the names there. Ms. Miller, I've been struck some of these questions about how people process these symbols and what messages they convey. But you sort of accepted this idea that that's what we should be thinking about. But why isn't it enough to just say, does erecting a symbol like this align the government with a particular religion and not align it with every other religion? That's right, Your Honor. That is actually more the test that we put forth in our brief. If we notably don't use the reasonable observer test, I think the reasonable observer test in some situations might be helpful, especially when you need to put yourself in someone else's shoes. But it's really just a proxy for facts. We're saying look at the facts. There's a 40-foot cross. It's in the middle of the highway. It dominates all the other newer displays that the city has put up or the town's put up recently. There's bushes obscuring the plaque. There are no walkways, by the way, to the cross. You have to risk life and limb to get over the lanes of traffic. You do suggest at various points we should consider how people process things and whether they're offended, and elsewhere you don't. And I guess I am curious in response to Justice Kagan, you say we shouldn't apply lemon in this case. It's been a long time since this Court has applied lemon, but yet the Courts of Appeals continue to cite it and use it, and their reasonable observers process things in all sorts of different ways. And it has resulted in a welter of confusion, I think, by anyone's admission, including your own. Is it time for this Court to thank lemon for its services and send it on its way? No, Your Honor, I do not think so. I think there's a difference between lemon and the reasonable observer. The reasonable observer is an overlay that comes from Justice O'Connor who's trying to acknowledge and reconcile the complexity of the cases. And I think the reasonable observer is one that— But if you don't find it useful in this case, and you don't want the Court to apply it in this case, what about all those poor Court of Appeals judges who are left still with confusion? We haven't overruled it, but we never use it anymore, except for when we might have 25 years ago. And I think a majority of this Court, though never at the same time, has advocated for lemon's dismissal. So is it really fair on the lower court judges struggling to apply this Court's dictates if we don't provide an answer on lemon? On the contrary, Your Honor, I think that lemon is very useful. I think when you heard the arguments earlier today, they talked about context, they talked about purpose, they talked about effect. That's the crux of lemon. But how can it be useful when we haven't used it in the most important cases that are on point here? Cases like Town of Greece, it's not used. Van Orden, Marsh v. Chambers, those are the cases that are on point. They just go back 40 years, and we haven't used the test. And to Justice Gorsuch's point, the lower courts need some clarity about that. If the test isn't being used, that would suggest that the test doesn't work for this context. Your Honor, I would submit that the Court really hasn't had the proper opportunity to apply lemon since Van Orden, although remember that Van Orden was decidedly— Well, Town of Greece was certainly a case, and that's about prayer before a legislative meeting. Well, Town of Greece was extending Marsh, which had jettisoned lemon. But the Court comes back to saying in, for instance, Trump v. Hawaii, that—reiterating the Larson test, which is that the clearest command of the Establishment Clause is one denomination and can't be preferred to another— that case relies on lemon. But more importantly, I think that, like I said, I think everyone agrees that purpose and effect are critical inquiries under the Establishment Clause. They long predated lemon. I think there was something like 14 cases pre-lemon that were purpose and effect cases. Lemon just enshrined those out of the third from Waltz about entanglement. I think you alluded to this earlier, but I wanted to ask it so I'm clear. The distinction between the Ten Commandments and the cross? It's twofold. One is that it has this dual meaning as a symbol of law. And so when it's conveyed, say, for instance, alongside Moses with 18 other lawmakers, the clear effect is, or impression is, this is a law symbol. When it's displayed in isolation or is for one denomination, I think Justice Scalia had a lot of good points about this in his McCreary dissent about how he perceived the Ten Commandments as being for—embraced by Judaism, Islam, and Christianity. But, for instance, if it was just the Christian version, which I'm not sure what that looks like, but assuming such can be the case, that might be a problem. The reason why we say the court doesn't need to reach lemon in this case is because there's an easier route, and that is the notion of one religion over another can't be preferred. Well, along those lines, would it be a violation of the Establishment Clause for the state to promote secularism or humanism as opposed to religion? Humanism, yes. If the government decided to put up a giant happy humanist symbol—it's like this man with little hands—if they decided to replace the cross with the happy humanist, 40 feet tall, and they said, this is the humanist monument, I think that would be a problem. Let me take you back to Justice Breyer's question, which is an interesting question to me. And your response was, he's wrong on the numbers. But I don't know. I've got pictures of lots of crosses that are on public land. Assuming for the sake of argument that there are 50, or there are a lot of them, and we say, you've got to take down all of the crosses, what message does that send? When people see that on TV, they see crosses all over the country being knocked down. Well, I don't think, Your Honor, that they need to be knocked down at all. In fact, our preferred remedy, I think, is the least divisive outcome of this case, which is to move it to private land. All right, moved, taken down, but they're taken down, one way or the other. What message is that? That may promote a particular worldview, but is that consistent with the Establishment Clause? Your Honor, with respect, I think you're forgetting the third option, which is transferring the underlying property, which this Court sanctioned in Buono, as well as the Ninth Circuit's sanctioning in— Let's just take that—we're fighting the hypothetical, counsel. Now, I love doing that too. But let's just stick with the hypothetical. You can't transfer it, you can't move it, you have to tear it down. Roadside crosses along public highways, for example, those are many, and in some places they've been ruled to be unconstitutional, including in my old court, because they endorse religion, proselytize. So, back to Justice Alito's question, if you could answer it, I'd be grateful, that would help me. Yes, I mean, I think that the message—again, I just want to say one fourth option, which is creating an open forum, something like Town of Greece. But with respect to bulldozing, you say, 50 crosses, I mean, certainly people will get the message that you can't prefer Christianity. But this Court has always rejected the idea that restoring the government to a place of neutrality is hostile to religion. In fact, I think that argument cuts directly against their argument that says this isn't a religious symbol. To say that it would be so hostile to religion, to move it to private land, to transfer land underneath it, I think really damages their argument in a way that, you know— It's not just an argument. It's partly guidance. I don't know if we can. It's a tough area. Okay, so I'm interested in your reaction, which now that Justice Alito mentions it, I did, and I didn't hear an answer. With respect to—well, I think the hypotheticals are difficult because I don't believe— It's not a hypothetical. I'm saying—a very good book, The Law and Its Compass, Lord Radcliffe, all our liberties come from freedom of religion. You have your religion. I have mine. And we're not going to kill each other. Okay? So we say history counts. Now, what he raises is a problem. So what about saying past is past? If you go back 93 years, but no more. We're now 54 religions. We're now everything under the sun. And people will take offense. Now, how do I do that? Is that sensible? Is it ridiculous? What do you think? Well, I think that there are ways to display a historical cross in a way that isn't the government currently being the mouthpiece for that sectarian speech. The 9-11 cross that petitioners speak of is a perfect example. It sits in an exhibit panel along with other pieces of rubble and an explanatory plaque about how it came to be. I think that if this were not being actively used by the town as an annual war memorial that every year after year the town is saying, this is how we honor our veterans, this giant cross. That's a constant message. It's not a historical artifact. What if other cities replicated the 9-11 cross? It's a different world. It's a different time. History's changed. But here's an example of a cross that has very contemporary meaning and to a lot of people. Would you prohibit cities and states from duplicating that cross on their public memorials to 9-11? So, just so I understand, you're saying they commission a cross that looks like a piece of rubble and then... I think it depends on how they're displaying it. Didn't you answer that it doesn't exist in splendid isolation? Exactly. It does not exist in isolation, yes. My question is, it's a 9-11 memorial and that's the predominant thing and there might be some names on it, just like our Bladensburg cross. Yes, Your Honor. Now it would certainly be a problem. That would be a cross that's being displayed as the government's war memorial, not as a piece of artifact that is in an exhibit in a museum context. Can we go back outside of hypotheticals to this case? Yes, Your Honor. Mr. Cachal said that the only way to have a remedy here is to destroy, change the cross or destroy it. He says you can't move it because it'll fall apart and you can't give it to the Legion because of safety concerns. Do you agree with his position on this? I don't agree. For one, with respect to moving it, we don't have any statements that say... There's one statement in the deposition that says it might be hard to move. But we also have deposition testimony saying that the state has moved large historic houses. So I have a hard time imagining that a house is more difficult to move. There's two World War I memorials that were in the center of medians. The reality is... I do understand also that the cross is falling apart and has to be fixed anyway. So whether it's fixed in a move or fixed in place in situ is irrelevant. It still has to be fixed. That's right, exactly. And I think that they're ignoring the key problem that their own experts have warned them about, which is that the current location is causing its demise. And that's why I say that I think our preferred remedy, which is moving it somewhere else, is the best situation for the cross. It can be placed in a place where people don't have to risk their lives to cross the street. They can actually come pay their respects. They can do so maybe a little bit more privately. May I go back to the question that's been underlying some of my colleagues' points and points you've been trying to make? It is contextual. The endorsement test is always contextual. And according to you, contextually, the 50 crosses that Justice Alito and Breyer are worried about, you don't think it's 50. You still think it may be only 10 or 20. So I accept that. Can we, given the nature of the right at issue, given that the other side concedes that there's extreme proselytization, that there is, and there has to be, because the First Amendment, there has to be de facto coercion to make any sense of the Establishment Clause. And defining that is always going to involve context. You are giving up the reasonable observer test. You were talking about an objective factors test. Could you go into that a little bit more? Yes, Your Honor. I think Part 1 of our brief details those factors. And I think all the factors relate to the government's imprimatur. So once you've accepted that we have a symbol that only honors one religion, because I see it as sort of two prongs. You're testing how, you know, is this a sectarian symbol? Does it, you know, prefer one religion to another? And then if so, is it the government putting its hands on it? I'd say the Arlington crosses, it's not, because one's donated by Canada. It's pursuant to this, like I said, statute that allows anyone to put them up. So the factors relate to how much government support is there. When you see it in the, you know, the size of it can matter insofar as it says how enthusiastic the city is about it. If you had a 90-foot cross and a two-foot Star of David, it says we really like Christians. We're okay with Jews. You know, and so I think the size, the placement of it, obviously in the most prominent parts of land, the more prominent it is, the more it begs the question, why is it there? Why did the government allow this? Well, I was just going to say, if I were, and once was, a lower court judge and I get that type of analysis, I'm just going to throw my hands up. Those are 20 different facts. How big is it? Where, you know, located? And maybe that's the best we can do. But do you have something more concise about the test you would apply beyond looking at all the contextual factors and history and all that? I mean, I think it's very difficult, and I think that's why the court hasn't come up with that one singular test, because the cases are complex. That's the Establishment Clause, and I think it actually helps us deal with each cross. That's why it's easy to say you don't have to tear down any other crosses after this. Each one is evaluated with a specific fact, and I know that that is not the best answer you want to hear, but the reality is no one has come up with a better test than Lemon. We don't need the reasonable observer when we can look at facts. So you just said no other cross has to be torn down, just this one. Would you like us to write that in the opinion? I mean, with respect, this court has done that. I mean, in its cases it says, you know, we're not deciding anything more. This one was a perfect example. Let's say we're going to write an opinion, and we're going to say this cross is particularly bad. This one has to be moved, torn down, transferred, and so forth. But every other cross is fine. Is that what you just said? No, Your Honor, that's not what I said. What I said was that this court says, you know, cases are ill-suited for sweeping pronouncements and categorical rules. So when the court says that, it says, you know, not every cross is going to be torn down, not every cross is going to be upheld. And I think that's an appropriate way to leave room for exceptions. Your argument sounds in liberty. You raised an important liberty argument. In thinking about a liberty claim, I think the Constitution tilts toward liberty in its structure, and one of the ways it does so is there are lots of avenues for you. The Bladensburg Council could change its approach here. The Maryland legislature could say no more. The Maryland Constitution, as Judge Sutton would remind us, or the Maryland courts could prohibit it. With that in mind, the Establishment Clause test reference to historical practice can be thought of as setting a floor, an important one, but there are other ways the Constitution tilts toward liberty and other avenues. How should we think about that, or should we think about that at all, or is that irrelevant to us? I mean, liberty is absolutely important, and I think that's where the brief of the Baptist Joint Committee and all the Christian groups, you know, joined saying that a ruling upholding this cross would definitely degrade and damage their free exercise of their religious liberty beliefs. With respect to a test, even in town of Greece, the court talks about not allowing a policy that excludes or discriminates against nonbelievers, and I think in that regard it actually even goes farther in favor of nonbelievers in Marsh because I believe some justices interpreted Marsh to mean you can disregard atheists, and in town of Greece the court said no, you can't. I guess my question was in thinking about our role, what is the role of this court in a case like this? Should it matter that we know that the Bladensburg Council, the state legislature of Maryland, the Maryland Constitution are all there, or is that irrelevant to how we think about this? May I? You have a couple minutes left. Okay. How Maryland decides to, I guess I'm just not quite understanding the question. The fact that there are other ways in which the cross, other bodies that can decide the cross is too much. The local council could, the Maryland legislature, and I'm not saying that's the right answer, I'm just saying is that relevant to how we think about our role in a case like this or not? So it's like the Maryland legislator decides that the cross is universal? No, that the cross should come down. In other words, the Bladensburg Council could transfer the property to the Maryland legislature, the Maryland state courts, the Maryland Court of Appeals could decide. The remedy, is that what you're getting at? Yes. I mean, I think the remedy is certainly relevant to considering that it doesn't need to be torn down, but I don't know if that plays into the question of is this constitutional. I think the question is different. I think the question is, do we think that since there are other avenues available, that the Constitution doesn't require this floor as a constitutional floor for an establishment clause violation? I think that's the question that's being asked. Oh, then the answer is no, I don't think that that's relevant at all. I mean, the establishment clause is Trump's statutes and so forth, so I think that would be, yeah. So we ask that this Court affirm. Thank you, Counsel. Three minutes, Mr. Katyal. Thank you. Ours is a middle path between my three excellent friends. The easiest way to resolve this case is to say in the wake of World War I, crosses like this one have an independent secular meaning. As Justice Kavanaugh said before, this Court's decisions recognize that symbols, including religious symbols, have dual meanings. And you can look to Van Orden for that, or you could just look up. And Mr. Katyal, how do you – It doesn't really have a dual meaning, Mr. Katyal. It is the preeminent symbol of Christianity. People wear crosses to show their devotion to the Christian faith. We don't disagree with any of that, Justice Ginsburg. Our only point is the same one that the Bono plurality made, is that crosses, particularly World War I ones, have a second meaning, and that meaning is what makes it constitutional. That's why we disagree with my friends here, because we think that their approach would risk the destruction of this 93-year-old memorial, which has that real long tradition going back to the field of Flanders. Mr. Katyal, there's a call and a discussion about undoing Lehman altogether, substituting something like a coercion test, whatever, with or without limits. What position are you taking on behalf of – We profoundly disagree. We think it's unnecessary and unwise. It's unnecessary because, as their own briefs say, the best evidence of this is the last pages of each of the briefs by the Solicitor General and the Legion. They say the existing tests make this an easy case to save the cross. So it's not presented here. If, Justice Gorsuch, you're concerned about Lehman, wait for a case in which it has some bite. Here, every test, whatever test you apply, yields the same result. You're in the same boat, though, of saying, apply Lehman, keep Lehman, keep it around for a rainy day. But please, please, please do not apply Lehman to this case. Well, we're happy with you applying Lehman. Our brief says that that would be constitutional. We just think this court in Van Orden has said you didn't – for passive monuments, it's not necessarily the most important one. What if we think it's unconstitutional under Lehman? What's your view then? Well, I think it would be very impossible for reasons that – for reasons our brief explains to find it. What if it's unconstitutional under Lehman? The other side so argues. I'd appreciate an answer to that question. Yeah, so, I mean, if it's unconstitutional, then I think we would say you should take a look at Lehman because then it would be necessarily presented. Right. But we think you'd have to do so much work to get there, Justice Kavanaugh, that it would be a distortion of Lehman. And my friends say that there are, you know, disagreements in the lower courts. Our cert petition outlines the disagreements in the lower courts. They're largely on crosses. Our test resolves that. It resolves the objective observer disputes and resolves the longevity question of which there's a circuit split. But to take this case and go further, particularly because, you know, as the Chief Justice said, they're selling you some clean test, but in the end, you know, when push comes to shove, they have indirect coercion, proselytization, you know, and all these other things. Who knows what those mean? The one thing we do know it means is that it's going to permit crosses like the Lake County Cross with Jesus nailed to the center of it in public parks. And that, to me, is a radical change in the law. Thank you, counsel. The case is submitted.